[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1000 
Frank Larry Dickerson was indicted by the March, 1981, Session of the Calhoun County Grand Jury for trafficking in cannabis contrary to § 20-2-80 (1)(a), Code of Alabama 1975 (Supp. 1981). A mistrial was declared in appellant's first trial. He was retried on September 28 and 29, 1981, with the jury finding him guilty as charged. He was sentenced to five years' imprisonment and assessed a fine of $25,000.00. From that conviction he now appeals.
Around 6:15 p.m. on Saturday, November 15, 1980, District Investigator Charles Winfrey, along with several members of the Anniston Police Department, executed a nighttime search warrant at the residence of appellant in Anniston. Appellant was present during the search which produced, from a closet of a rear room, a large plastic bag containing eleven smaller bags of cannabis. Their total weight was 8.47 pounds. Also found were several items of drug paraphernalia and two smaller bags of marihuana.
Anniston Police Officer Michael Hembree procured the instant search warrant based upon his sworn affidavit. This affidavit contained information given to him from a reliable confidential informant. Officer Hembree testified that he found the cannabis in the rear of the house. The informant had told Hembree that only hours before he had seen the cannabis moved from that area of the house. *Page 1001 
Appellant, after being shown the cannabis, was arrested and given his Miranda warnings. He stated to the police that "it wasn't really his stuff, that he was keeping it for somebody else and it was just brought there that day." (R. 21).
A more detailed narration of the facts is unnecessary as the pertinent portions thereof will be discussed in conjunction with appellant's issues.
 I
Appellant contends that the state failed to prove that he was in possession of more than 2.2 pounds of cannabis. He does not contend that he was not in possession of the controlled substance, but rather that the state failed to prove that he possessed a quantity sufficient to come under the purview of §20-2-80 (1)(a).
In support of its contention that it had sufficiently proved the requisite quantity of cannabis, the state offered the testimony of Anniston Police Lieutenant Richard Townsley, supervisor of the Anniston Police Crime Laboratory.
After being duly qualified, to which no objection was taken, Townsley testified that he received one garbage bag containing eleven plastic bags of plant material. A smaller quantity of plant material was also received but was not commingled with that taken from the garbage bag. Townsley weighed the plant material from each of the eleven bags, totaled their weights, and found the total weight of the plant material to be 8.47 pounds. Townsley testified that he did not separate the seeds, which were scattered throughout the plant material, prior to weighing it. Nor did he know whether they were capable of germination. He testified that in order to determine the sterility of a seed, he would "take all the seeds from the sample, that would just take hundreds of man-hours to do that. We would create a proper environment free of any other seed material, and under controlled conditions would attempt to grow one of the seeds. And when we grew one of the seeds, and it germinated, I guess that would satisfy that requirement. We've never done that and I don't know that anybody else has ever gone to that extreme." (R. 52). He stated that such would have to be done to the thousands of seeds contained in the plant material. Townsley stated that as far as he knew, a sterile seed had the same appearance as a fertile seed. He stated that no tests were run on the seeds to determine their fertility and germinating capabilities. Townsley testified that the plant material also contained seed fragments.
Townsley testified that he did not remove any stems from the plant material stating, "there was not anything in there that was big enough to separate from." He stated that the plant material contained "stems in there, but what comes off of the shaft, the trunk of a plant, up to the leaf might be construed as a stem." He continued, "I'm not a botanist, so what's between a leaf and what-what might still be considered a part of the leaf, and what could be more of a stem, and yet not be the stalk-who's to say?" (R. 47). Townsley testified that he did not find a considerable or abnormal number of stems in the plant material, but some of the individual bags contained more than others. While no testimony was elicited concerning whether the plant material contained any mature stalks, it indicates that the plant material contained none.
Townsley, terming his opinion merely a guess, stated that the plant material would meet the requisite weight requirement of the instant offense with any and all objectional matter excised therefrom. He testified that he did not know if there was a difference between marihuana and cannabis. However, he stated that THC or tetrahydrocannabinol was the illegal chemical contained in the plant material. Townsley opined that the plant material was "cannabis marihuana."
Section 20-2-80 (1) does not define the term "cannabis." However, in § 20-2-112 (2), Code of Alabama 1975 (Supp. 1981), cannabis is defined for purposes of the Controlled Substance Therapeutic Research Act, § 20-2-110 et seq. Code of Alabama 1975 (Supp. 1981), as follows: *Page 1002 
 "Cannabis. The same as those substances defined in subdivision (15) of section 20-2-2, as amended, and particularly those substances defined as tetrahydrocannabinols, or a chemical derivative thereof;"
To follow such an approach in defining cannabis for the purpose of § 20-2-80 (1) would be consistent with how the legislature defined the other substances controlled under our trafficking statute, §§ 20-2-2 (16), (17), -25 (1), Code of Alabama 1975, and the definition of cannabis used in the Theraputic Research Act. It would also conform with existing case law. Beasley v. State, 408 So.2d 173 (Ala.Cr.App. 1981), cert. denied, 408 So.2d 180 (Ala. 1982); Sharpe v. State,384 So.2d 633 (Ala.Cr.App. 1980); Radney v. State, 342 So.2d 942
(Ala.Cr.App. 1976), cert. denied, 342 So.2d 947 (Ala. 1977);Smith v. State, 335 So.2d 393 (Ala.Cr.App.), cert. denied,335 So.2d 397 (Ala. 1976); McKenzie v. State, 57 Ala. App. 69,326 So.2d 135 (1976); Hill v. State, 56 Ala. App. 369,321 So.2d 708, cert. denied, 295 Ala. 405, 321 So.2d 713 (1975); Haynesv. State, 54 Ala. App. 714, 312 So.2d 406, cert. denied,294 Ala. 758, 312 So.2d 414 (1975); Peppers v. State, 53 Ala. App. 695, 304 So.2d 39, cert. denied, 293 Ala. 770, 304 So.2d 43
(1974).
Thus, we consider the definition of cannabis as used in §20-2-80 (1) the same as the definition of marihuana found in §20-2-2 (15), Code of Alabama 1975.
Section 20-2-2 (15) defines marihuana as:
 "Marihuana. All parts of the plant Cannabis sativa L., whether growing or not, the seeds thereof, the resin extracted from any part of the plant and every compound, manufacture, salt, derivative, mixture or preparation of the plant, its seeds or resin. Such term does not include the mature stalks of the plant, fiber produced from the stalks, oil or cake made from the seeds of the plant, any other compound, manufacture, salt, derivative, mixture or preparation of the mature stalks (except the resin extracted therefrom), fiber, oil or cake or the sterilized seed of the plant which is incapable of germination."
(Emphasis added.)
As shown above certain portions of marihuana are excluded from control. Specifically, those portions excluded are the mature stalks and derivatives thereof, certain products derived from the plant seed, and the sterilized seed of the plant which is incapable of germination. In the instant case, it is clear that no mature stalks were present in the marihuana. However, from Townsley's testimony, it is plain that it contained seeds and branches of the plant, although he referred to the latter as stems.
It is well established that the burden is upon the appellant to establish and bring himself within any exclusion which is found not in the enacting clause defining a crime but rather in a subsequent clause or statute. Specifically, he must establish that the marihuana seized from his residence contained excludable matter falling within the definition of such under §20-2-2 (15). See Hall v. State, 291 Ala. 397, 281 So.2d 662
(1973); Peppers, supra; State v. Buchman, 361 So.2d 692 (Fla. 1978); State v. Carter, 214 Kan. 533, 521 P.2d 294 (1974);State v. Brothers, 212 Kan. 187, 510 P.2d 608 (1973); State v.Dixon, 546 S.W.2d 774 (Mo.App. 1977); Elkins v. State,543 S.W.2d 648 (Tex.Cr.App. 1976). 1 Underhill's Criminal Evidence § 54 (6th ed. 1973); 1 Wharton's Criminal Evidence § 20 (13th Ed. 1972). See also Cockrell v. State, 392 So.2d 541
(Ala.Cr.App. 1980), cert. denied, 392 So.2d 545 (Ala. 1981);Lee v. State, 350 So.2d 743 (Ala.Cr.App. 1977).
Thus, the question becomes whether appellant sufficiently established that portions of the cannabis seized were within the exclusions of § 20-2-2 (15).
 A
The evidence is clear that appellant only established that the cannabis contained seeds. He did not establish that they were the type of seed excluded, that being sterilized seeds.
In the context of the instant case, sterile means incapable of germinating, while sterilized means to have caused to become sterile, barren, or unproductive so as to deprive (the seed) of the power of reproducing — *Page 1003 make incapable of germination or fecundation. Webster's ThirdNew International Dictionary, page 2238; Volume X, The OxfordEnglish Dictionary, pages 926-27, (1961). (Emphasis added). Consequently, the term sterile connotes a natural or organic inability to reproduce or germinate, while the term sterilized denotes an artificial process utilized to effect a sterile state or condition.
Under § 20-2-2 (15), seeds are not excluded from the definition of marihuana unless they are sterilized. See generally, State v. Zeiter, 119 Ariz. 193, 580 P.2d 331 (1978). The burden of establishing such is upon appellant. Having failed to do so, we find that inclusion of the seeds for weighing purposes was not error. Thus, denial of his motions to suppress and exclude the state's evidence on this ground is without error. See generally, People v. Atchley, 97 Ill. App.3d 85, 52 Ill.Dec. 585, 422 N.E.2d 266 (1981).
 B
Next, we must determine whether it was proper for the state to have included the branches found in the cannabis for weighing purposes.
Section 20-2-2 (15) excludes the mature stalks of the marihuana plant from control. Nowhere does it use the term stem or branch. However, it is clear that the terms stalk and stem refer to the same portion of the plant, namely the main body or ascending axis of the plant which supports the secondary branches, leaves, and fruit. Webster's Third New InternationalDictionary pages 2221, 2235 (1971); Volume X, The OxfordEnglish Dictionary pages 783, 909 (1961).
The word branch has been defined as "to branch off or out of; offshoots springing out of or from the main body. . . ." Davisv. Jones, Tex.Civ.App., 116 S.W.2d 461 (1938). More specifically, it has been defined as ". . . a shoot or secondary stem growing from the main stem," Webster's Third NewInternational Dictionary page 267 (1971), or "a portion or limb of a tree or other plant growing out of the stem or trunk, or out of one of the boughs," which ". . . is understood to be smaller than a bough and larger than a shoot or spray." Volume I, The Oxford English Dictionary page 1052 (1961). Thus, a branch of a plant is a subdivision of the ascending axis or stem or stalk which supports other aerial portions of the plant. By definition, it is not a stem or stalk, regardless of its maturity and similarity of structure, composition, or purpose.
The discussion attending the adoption of the now repealed Marihuana Tax Act of 1937, ch. 553, 50 Stat. 551 (1937) (codified at 26 U.S.C. § 4741 et seq. (1964)), where the definition of marihuana now embodied in § 20-2-2 (15) was first used by the federal government, sheds some light as to the reasons why portions of the marihuana plant were excluded from control. A close reading of the House and Senate debates on the Act as well as the extension of remarks indicates that several legitimate commercial uses existed for certain portions of the marihuana plant including, ". . . the extraction of oil from the seeds, which is used in the manufacture of paint and varnish; and the production of hemp fiber from the maturestalks, which is manufactured into twine. Cattle feed and fertilizer are also manufactured from the residue of the seed, and the seed itself is mixed with other seeds, as birdseed." H.R. Rep. No. 6906, 75th Cong., 1st Sess. 1440 (Appendix 1937). (Emphasis added). See H.R. Rep. No. 6906, 75th Cong., 1st Sess. 5689-90 (1938); See generally, Cohrssen and Lieberman,Cannabis: A Forensic-Medical Review, 1 Drug Abuse L.Rev. 86 (1971).
The Senate amendments to the definition of marihuana clearly evidence its intent to exclude from control, inter alia, those portions of the mature stalk capable of producing fiber for use in the production of twine or rope. H.R. Rep. No. 6906, 75th Cong., 1st Sess. 7398 (1937).
Thus, the intent of Congress in excluding certain portions of the marihuana plant from control was to protect those legitimate interests which used those portions *Page 1004 
in their business, field of trade, or research. More specifically, Congress intended to exclude from control only the mature stalk of the marihuana plant rather than the mature stalk and its botanical subdivisions as it was a source of fiber for the production of twine and rope and thus had a recognized and proven commercial use.
Numerous sources support the above conclusion. A synthesis of those sources reveals that the male cannabis plant has the most commercial utility for the production of hemp. It is more slender and less heavily branched than the female cannabis plant. Depending upon soil, climate, and variety it can vary in size from three to four to 15 or 20 feet. Both manual and mechanized means of harvesting are used as well as natural or "dew-retting" and artificial or "water-retting." "The cells which produce the fibre of commerce are formed in the stems (stalk) between the cambium and the epidermis, and specifically occur in the phloem and pericycle. In other words, the fibre is in that part of the stem (stalk) which is commonly called bark." Volume 11, Encyclopedia Britannica, pp. 421-22 (1963). (Parentheticals added).
In order to produce the long fibers which may be anywhere from three to nine feet long, the plant is prepared for processing by stripping of leaves and flowers. Volume 14,Encyclopedia Americana, pp. 87-88 (1980). While shorter fibers are commercially used, they are derived from waste fibers of the original fibers obtained from the stems or stalks. Id., see generally S.H. Curry and C.R.B. Joyce, The Botany and Chemistryof Cannabis. Williams and Wilkins Company, Baltimore (1970); Volume IV, The New Encyclopedia Britannica Micropaedia, p. 1016 (1974); Volume 11, The New International Encyclopedia, pp. 131-32 (2nd ed. 1915); Volume XIII The Encyclopedia Britannica, pp. 263-64 (11th ed. 1910).
Consequently, our legislature in adopting § 20-2-2 (15) did not intend to exclude the branches of the marihuana plant from control. While it may be that fiber obtained from a processed branch and stalk is indistinguishable (although we have found nothing to either support or contradict such a conclusion), seePurifoy v. State, 359 So.2d 446 (Fla. 1978), the intent of the legislature in adopting § 20-2-2 (15) was to exclude only the mature stalk from control for the obvious reason that it held commercial utility. The noticeable lack of discussion concerning the commercial use of the branch convinces us that it was not intended to be excluded with the mature stalk. To do so would result in an exclusion by implication, something we are convinced the legislature did not intend.
Thus, it was proper for the branches to be included for weighing purposes as they are not excluded under § 20-2-2 (15). Consequently, a prima facie case of trafficking in cannabis was proven by the state and the trial court properly denied appellant's motions to suppress and exclude the state's evidence on this ground.
 II
The state fully established that appellant was in actual or consecutive possession of the cannabis. It was seen by the confidential informant in the living room of appellant's residence only four hours before seizure. In addition, appellant, after being arrested and given his Miranda rights, admitted possession to the police but denied ownership. Thus, denial of his motion to exclude the state's evidence on this ground was proper. Beasley, supra; Yarbrough v. State,405 So.2d 721 (Ala.Cr.App.), cert. denied, 405 So.2d 725 (Ala. 1981). See also Green v. State, 384 So.2d 1215 (Ala.Cr.App. 1980).
 III
Appellant contends that § 20-2-80 (1) is unconstitutional as it provides for no maximum sentence. Consequently, he argues that it is unconstitutionally vague and indefinite, and runs afoul of the doctrine of separation of powers expressed in Article III, § 43 of our constitution. *Page 1005 
 A
In several instances, statutes with similar sentencing schemes as § 20-2-80 (1), have been determined not to be constitutionally infirm as too vague or indefinite. UnitedStates v. Hayes, 589 F.2d 811 (5th Cir. 1979); United States v.Kuck, 573 F.2d 25 (10th Cir. 1978); Earin v. Beto, 453 F.2d 376
(5th Cir. 1972); Binkley v. Hunter, 170 F.2d 848 (10th Cir. 1948), cert. denied, 336 U.S. 926, 69 S.Ct. 645, 93 L.Ed. 1087
(1949); United States v. Greene, 510 F. Supp. 128 (E.D.Pa. 1981); Western Union Telegraph Co. v. State, 82 Ark. 309,101 S.W. 748 (1907); Sweigart v. State, 213 Ind. 157, 12 N.E.2d 134
(1938); see generally United States v. Jones, 540 F.2d 465
(10th Cir. 1976), cert. denied, 429 U.S. 1101, 97 S.Ct. 1125,51 L.Ed.2d 551 (1977).
Unless there exists some constitutional or statutory limitation, the sentencing power under these statutes rests within the sound discretion of the trial court. In the instant case, § 20-2-80 (1) sets no limitation on the maximum sentence that may be imposed. However, Article I, § 15 of the 1901 Alabama Constitution expressly limits the infliction of excessive fines and cruel and unusual punishment. Consequently, the limitation upon the trial court in sentencing under §20-2-80 (1) would be that of § 15, supra, as well as the Eighth Amendment to the United States Constitution made applicable to the states through the Fourteenth Amendment. Therefore, the punishment inflicted under § 20-2-80 (1) must not be grossly disproportionate to the severity of the crime, or be shocking to the sense of justice or the conscience of reasonable persons, or outrage the moral sense of the community. For objective criteria in applying the proportionality principle, see Wanstreet v. Bordenkircher, 276 S.E.2d 205 (W.Va. 1981). Even a maximum sentence of life imprisonment for conviction of a drug offense has been held not violative of the Eighth Amendment. People v. Broadie, 37 N.Y.2d 100, 371 N.Y.S.2d 471,332 N.E.2d 338, cert. denied, 423 U.S. 950, 96 S.Ct. 372,46 L.Ed.2d 287 (1975); State v. Terrebonne, 364 So.2d 1290 (La. 1978); Opinion of the Justices, 378 Mass. 822, 393 N.E.2d 313
(1979); People v. Eason, 40 N.Y.2d 297, 386 N.Y.S.2d 673,353 N.E.2d 587 (1976); People v. Molinares, 110 Misc.2d 1079,443 N.Y.S.2d 593 (1981); People v. Johnson, 79 A.D.2d 617,433 N.Y.S.2d 477 (1980).
Consequently, we find § 20-2-80 (1) not unconstitutionally vague or indefinite as to its sentencing scheme or violative of the separation of powers doctrine of § 43, supra.
 B
The Alabama Trafficking Statute of which § 20-2-80 (1) is a part was enacted after the effective date of our new criminal code. Consequently, appellant argues that the trafficking statute must be held void as it does not conform to the punishment and sentences chapter of the new criminal code. §13A-5-1 et seq., Code of Alabama 1975 (Amended 1977). We disagree.
A close reading of the commentaries following sections13A-5-1, -3, and -4 reveals that the legislature, in enacting new laws under Title 13A, must conform their punishments and sentences to the provisions of Chapter 5 thereof. However, they make clear that for penal statutes enacted outside the scope of Title 13A, such is merely "desirable." They specifically note that drug offenses fall outside the scope of Title 13A and provide for their own special penalties.
Thus, it is apparent, § 13A-5-1 (b) to the contrary, that the legislature intended to classify all subsequent penal laws falling within the scope of Title 13A, but retained its authority not to do so with respect to those penal provisions enacted subsequent to its effective date falling outside its scope.
Further, we feel that since § 20-2-80 (1) is not unconstitutionally vague, indefinite, and violative of § 43 of our constitution, it specifies its punishment pursuant to §13A-5-4 (a) supra, and thus, is outside the scope of Chapter 5 of Title 13A.
 IV
Appellant's challenge to § 20-2-81 (b) dealing with the discretionary power *Page 1006 
of the district attorney to move for a reduction of sentence upon appellant providing substantial assistance to his office has been answered to his detriment by this court in Wheatt v.State, 410 So.2d 479 (Ala.Cr.App. 1982). See also State v.Werner, 402 So.2d 386 (Fla. 1981); Stone v. State,402 So.2d 1330 (Fla.Dist.Ct.App. 1981); Stehling v. State, 391 So.2d 287
(Fla.Dist.Ct.App. 1980).
 V
Appellant raises several issues concerning the search of his residence and the affidavit supporting the search warrant. Three related issues are dealt with below.
 A
Appellant argues that the search warrant was improperly executed. The warrant was issued "To The Sheriff Or Any Constable Of Calhoun County, Alabama, Or To Any Other Lawful Officer Of The State of Alabama Authorized To Serve This Warrant."
Neither the State nor the appellant disagree as to who could legally execute the warrant, that person being Mr. Charles Winfrey, an investigator for the district attorney's office. Rather, appellant contends that 1980 Alabama Acts 261, No. 185, (hereinafter referred to as Act No. 80-185) which grants the investigator the power and authority of a deputy sheriff is violative of Article IV § 45 of the 1901 Alabama Constitution as it contains matters not related to the title and consequently does not contain a clearly expressed single subject.
Act No. 80-185 reads as follows:
 "Relating to Calhoun County; relating to the office of District Attorney, which provides for the payment of salary and expenses of an investigator appointed by the District Attorney in said county.
"Be it Enacted by the Legislature of Alabama:
 "Section 1. The District Attorney of Calhoun County may appoint an investigator to conduct investigations of alleged violations of law in the circuit. Such investigator shall be entitled to a salary on the same scale as deputy sheriffs of that county receive. The salary shall be paid from the general fund of Calhoun County as other county employees are paid, and the necessary expenses incurred in investigation. He shall be furnished an automobile by the county for which he is employed and such county shall pay the expenses thereof.
 "Section 2. The investigator shall have the same authority and powers vested in deputy sheriffs and all other law enforcement officers of the State of Alabama. He shall be responsible to the district attorney and shall perform all duties assigned him by such official.
 "Section 3. This act shall become effective immediately upon its passage and approval by the Governor, or upon its otherwise becoming a law."
The purposes of § 45 have been stated to be: (1) to fairly apprise the public of the subjects of legislation that are being considered so that it may have an opportunity to respond thereto, (2) to truly inform the members of the legislature of the subject of a bill so that they may intelligently and faithfully execute their duties, and (3) to prevent the inclusion of matter in a bill incongruous with the title which possibly could not individually obtain legislative assent but when combined with other matter into one bill would by reason of such gain favor and secure passage. State v. Hester,260 Ala. 566, 72 So.2d 61 (1954); See also Alabama EducationAssociation v. Grayson, Ala., 382 So.2d 501 (1980). Section 45 is not to be exactingly enforced in such a manner as to cripple legislation or to be enforced with hypercritical exactness, but is to be accorded a liberal interpretation. B.F. GoodrichCompany v. Butler, 56 Ala. App. 635, 324 So.2d 776, cert. denied, 295 Ala. 401, 324 So.2d 788 (1975).
The test in determining the constitutionality of an act under § 45 is "whether the title of the act is so misleading and uncertain that the average legislator or person reading the same would not be informed of the purpose of the enactment."Alabama Education Association v. Grayson, supra at page 505. *Page 1007 
Section 45 does not require that the title of an act be an index or catalog of every provision nor of every effect of the act. Shelby County Commission v. Smith, Ala., 372 So.2d 1092
(1979); Lane v. Gurley Oil Co., Ala., 341 So.2d 712 (1977);Newton v. City of Tuscaloosa, 251 Ala. 209, 36 So.2d 487
(1948); Dannelley v. State, Ala.Cr.App., 397 So.2d 555, cert. denied, Ala., 397 So.2d 577 (1981). Furthermore, the one subject requirement is met when the separate provisions of a bill are germane to the bill's general purpose and have a mutual connection with the subject proper. Thomas v. Niemann, Ala., 397 So.2d 90 (1981); Opinion of the Justices, 294 Ala. 571, 319 So.2d 699 (1975); Boswell v. State, 290 Ala. 349,276 So.2d 592, cert. denied, 414 U.S. 1118, 94 S.Ct. 855,38 L.Ed.2d 747 (1973); Opinion of the Justices, 277 Ala. 630,173 So.2d 793 (1965).
Appellant argues that § 45 was violated because the title of Act No. 80-185 refers to Calhoun County, while Section 1 therein makes a reference to the Seventh Judicial Circuit.
The Seventh Judicial Circuit consists of Calhoun and Cleburne Counties, § 12-11-2, Code of Alabama 1975 (Supp. 1981), and the district attorney is elected to serve both counties. §12-17-180, Code of Alabama 1975. He may employ support personnel if necessary. § 12-17-220, Code of Alabama 1975 (Supp. 1981).
Merely because Section 1 defines Winfrey's scope of authority as that of the circuit does not invalidate the Act because the title refers only to Calhoun County. The investigator is responsible to the district attorney, whose scope of authority encompasses the boundaries of the Seventh Judicial Circuit. Act No. 80-185 funds the position of investigator only from the coffers of Calhoun County. Thus, for payroll purposes he is treated as an employee of Calhoun County although his duties extend to both Calhoun and Cleburne counties.
Section 1 concerns itself with the power of the district attorney to appoint an investigator and the salary scheme by which he is to be paid. It also defines the boundaries of his authority, that being the same as that of the district attorney. Section 2 defines the scope of authority the investigator possesses in executing his duties. It places him under the direct authority of the district attorney who defines and assigns his duties.
We do not find anything in either Sections 1 or 2 to run afoul of the "single subject" and "single title" requirements of § 45. Only one subject is dealt with in Act No. 80-185, namely that of appointment, payment, and definition of authority and duties of an investigator. Further, both sections are germane to the Act's general purpose and have a mutual connection with the subject proper. Consistent with the above is the case of Yeilding v. State, 232 Ala. 292, 167 So. 580
(1936), where an act affecting both counties and municipalities located therein was held not violative of § 45.
In addressing itself to identical constitutional considerations concerning an act affecting the salaries of certain state officers and employees, the Supreme Court inState Docks Commission v. State, 227 Ala. 521, 150 So. 537
(1933), made the following observation:
 "Pay and salary are common attributes of all offices and employments. In practically every act creating a new office, board, or commission, the duties of the incumbent and his pay were both set out in the law. No one has ever contended that such acts contain one subject of duties and another subject of compensation."
 B
Having found Act No. 80-185 not violative of § 45 of our constitution, it is clear that Investigator Winfrey had the authority to execute the instant search warrant. Rivers v.State, 406 So.2d 1021 (Ala.Cr.App.), cert. denied,406 So.2d 1023 (Ala. 1981). We find unpersuasive any distinction as to "who was assisting whom" as the facts reveal that Winfrey personally executed the warrant. *Page 1008 
 C
Furthermore, it is obvious that the office of district attorney falls under the purview of the executive rather than the judicial branch of government. While the office of district attorney may be enumerated in § 6.20 (a) of Amendment No. 328 to the 1901 Alabama Constitution, the district attorney is not a judicial officer or a part of the judicial branch of government because of his office. Yolo County v. Joyce,156 Cal. 429, 105 P. 125 (1909); People v. Lichtenstein, Colo.,630 P.2d 70 (1981); People v. District Court In and For the Countyof Larimer, 186 Colo. 335, 527 P.2d 50 (1974); State v.Leonardis, 73 N.J. 360, 375 A.2d 607 (1977); In Re RingwoodFact Finding Committee, 65 N.J. 512, 324 A.2d 1 (1974); Statev. Winne, 12 N.J. 152, 96 A.2d 63 (1953); Pace v. State,566 S.W.2d 861 (Tenn. 1978); see generally People v. Vaughn,49 Ill. App.3d 37, 6 Ill.Dec. 932, 363 N.E.2d 879 (1977); People v.Stinger, 22 Ill. App.3d 371, 317 N.E.2d 340 (1974).
The district attorney is a public officer representing the sovereign power of the people and has been defined as "the foremost representative of the executive branch of government in the enforcement of the criminal law in his county." 27 C.J.S. District and Prosecuting Attorneys § 1 (a) (1959). He is only an officer of the court to the extent that all attorneys are officers of the court. People v. Rodriguez, 13 Misc.2d 1004,178 N.Y.S.2d 993 (1958), cert. denied, 362 U.S. 984,80 S.Ct. 959, 4 L.Ed.2d 1009 (1959).
Amendment No. 328 does not give the judicial branch any power, authority, or control over the office of district attorney. No rule of judicial administration governs the office. Even the powers and duties of the district attorney make no reference to control and regulation by the judicial branch. Section 12-17-184, Code of Alabama 1975.
It is the obligation of the attorney general and the district attorney to expose and prosecute crimes. In Re White,53 Ala. App. 377, 300 So.2d 420, cert. denied, 293 Ala. 778,300 So.2d 439 (1974). Such is not the primary function of the judicial branch of government.
 VI
Appellant challenges the sufficiency of the affidavit supporting the search warrant. Specifically, he contends that the affidavit, which was based upon the hearsay information of a confidential informant, does not satisfy the positive averment requirement of § 15-5-8,[1] Code of Alabama 1975 for issuance of a nighttime search warrant. Thus, he asserts that the trial court erred in denying his motion to suppress the evidence seized at his residence.
We quote the pertinent portions of the affidavit supporting the issuance of the search warrant.
 "My name is Michael Hembree. I am a Police Officer for the City of Anniston, Calhoun County, Alabama. I have received information within two (2) hours prior to the making of this affidavit from a confidential and reliable informant who has given me information in the past which has proven to be true and correct and has led to the arrest and conviction of at least two or more persons on various violations of the law. Said informant has stated to me that he was at the residence of Larry Dickerson within the past four (4) hours and that while at this residence he saw a large quantity of marihuana contained in plastic bags being stored at the residence. Informant further stated to me that Dickerson produced the marihuana to him and stated that he did own the marihuana and that it was for sale. Informant also states that he has observed several other unknown individuals come to the residence and purchase marihuana *Page 1009 
from Dickerson, and that he has observed marihuana being stored in the residence on several other occasions recently. Informant further states that he is familiar with the substance marihuana and does believe the substance observed by him in Dickerson's house is marihuana. Based on the above stated information I have reason to believe and do believe that marihuana is presently being stored at 1316 Willet St., Anniston, Calhoun County, Alabama, the residence of Larry Dickerson." (R. 245) (Emphasis supplied).
At appellant's motion to suppress, Officer Hembree testified as follows:
 "Q Do you recall whether you gave Judge Albea any information other than what's contained in this affidavit, for you to secure this search warrant?
 "A Yes. I told him several things during the conversation, at the time he was reading the warrant; to the best of my recollection, that also in our Unit, Sergeant Ballard had been receiving information on him, taken complaints, and that I had received information on him from another individual several weeks prior, and a report from a person in the area about noticing an unusual amount of traffic at the house.
 "Q Did you put any of this information into your affidavit?
"A I put some of it in there, I believe.
 "Q You stated in this affidavit that you had an informant; is that correct?
"A Yes, sir.
 "Q You also stated that this informant had given you information in the past?
"A Yes, sir.
 "Q Has any of this information that you have received in the past led to arrests or convictions for violations of narcotics?
"A Yes, sir, on at least three or four occasions.
 "Q But you only said two occasions when you filled out the affidavit; is that correct?
"A I said at least two occasions."
. . . .
 "Q In regard to this information, did he ever give you information in the past that proved to be untruthful?
"A Not to my knowledge."
. . . .
 "Q But when you went to see Judge Albea, you did not rely strictly on the affidavit that you filled out, but you also supplied additional facts; is that correct?
"A Yes, sir."
. . . .
 "Q Would you briefly describe what happened when you arrived at the residence?
 "A We approached the residence, pulled up, parked in the front. Went to the front door and Charles Winfrey knocked on the front door. It was answered by Larry Dickerson's wife. Larry Dickerson was, best I recall, just in the doorway of the next adjoining room, and he came out. The search warrant was explained to him and executed by Mr. Winfrey.
 "Q When was the first time that you talked to Mr. Winfrey in regard to this particular search?
 "A I'm sure we probably called him at his residence to meet us at the police station and serve the warrant."
. . . .
 "Q Had your informant told you where in the residence this plant material would be located?
 "A When he saw it, to the best of my knowledge, he said it was brought into the living room from the rear of the house."
. . . .
 "Q When you filled out and submitted this affidavit to Judge Albea, did you include any information in that affidavit that was not from the informant, that you recall?
"A Yes, sir.
 "Q What information did you supply that was not based upon this hearsay information from the informant?
 "A The report I had from a person close to that area that there was a lot of traffic into the residence for brief periods of time." (R. 9-14) *Page 1010 
As both the state and appellant concede, there is a paucity of Alabama cases interpreting the positive averment requirement of § 15-5-8. Furthermore, appellant admits that the positive averment requirement may be satisfied without the affidavit containing "a positive or unequivocal statement that the property is on the person or property (place) to be searched." Appellant's brief at page 41. Dean v. State, 54 Ala. App. 270,307 So.2d 77 (1975).
Neither appellant's written motion to suppress filed below nor his argument following the testimony given in support of it, raise any issue concerning the sufficiency of the affidavit under the two-prong test of Aguilar v. Texas, 378 U.S. 108,84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). Rather appellant concentrates his argument upon the failure of the affidavit to meet the requirements of § 15-5-8. Consequently, nothing relating to such is preserved for our review. Nevertheless, we find that the affidavit sufficiently meets the requirements ofAguilar. Etheridge v. State, 414 So.2d 157 (Ala.Cr.App. 1982); see Funches v. State, 53 Ala. App. 330, 299 So.2d 771 (1974), cert. denied, 293 Ala. 752, 299 So.2d 778 (Ala. 1974), cert. denied, 419 U.S. 1114, 95 S.Ct. 793, 42 L.Ed.2d 813 (1975).
In Collins v. State, 410 So.2d 463 (Ala.Cr.App. 1982), we stated:
 "No search warrant can be issued unless supported by probable cause, § 15-5-3, Code of Alabama 1975; Alford v. State, Ala.Cr.App., 381 So.2d 203 (1979), cert. denied, Ala., 381 So.2d 206 (1980), and the judge or magistrate is satisfied that such exists. § 15-5-5, Code of Alabama 1975. "Probable cause may be based upon hearsay information from an informant as long as there is a `substantial basis for crediting the hearsay.' Clenney v. State, 281 Ala. 9, 198 So.2d 293 (1966). A substantial basis exists if the affidavit for the search warrant satisfies the following two-pronged Aguilar-Spinelli
test: the basis of knowledge prong and the veracity prong. Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).
 "The affidavit in the present case fully satisfies the first prong of the Aguilar-Spinelli test in that it sets forth the detailed observations of the informant while inside appellant's house."
In addition, the veracity prong was clearly established by the affidavit. Thus, it fully satisfied the two-pronged test ofAguilar and Spinelli.
In both Collins, supra, and Hare v. State, 390 So.2d 1126, (Ala.Cr.App.) cert. denied, 390 So.2d 1129 (Ala. 1980), the confidential informant had been in the residence of the accused and had reported what he had seen to the police officer shortly before he procured the search warrant. In both cases it was held that such satisfied the positive averment requirement of §15-5-8 even though the affiant-police officer had not directly and personally viewed the property in the place to be searched.
In Dean, supra, the police officer had personally viewed the property on the premises prior to his procuring the search warrant.
In Pianzio v. State, (Ms. February 24, 1981) (Ala.Cr.App. 1981), two nighttime search warrants were issued upon affidavits of a deputy sheriff who had based his information therein on a "BOLO" bulletin issued by U.S. customs officials in New Orleans and a police dispatch from the county sheriff. The deputy had not observed any of the events giving rise to either broadcast. Thus, his affidavits were based solely upon hearsay information, albeit from law enforcement officers. After holding the search warrants invalid, we discussed the positive averment requirement of § 15-5-8 and found that the affidavits also had failed to sufficiently satisfy such:
 "Assuming arguendo that the difference between `he has reason to believe' and `he is positive' be considered a matter of technicality, we are here faced with a situation where the affiant could, under no circumstances, `state positively that the property is . . . in the place to be *Page 1011 
searched.' Byrd simply had no way of positively knowing whether or not the contraband was in the airplane or automobile. Byrd received all his information from U.S. Customs and Sheriff Benton, and, as can be seen from the record, the information they had was based on guesswork and speculation. Because the search warrants were executed in the nighttime, upon the face of the warrants and accompanying affidavits, the searches were conducted illegally."
Thus, in Pianzio, since the information in the affidavits proved to be false, it could not supply the positive averment necessary under § 15-5-8.
Finally, in Peavy v. State, 336 So.2d 199, (Ala.Cr.App.), cert. denied, 336 So.2d 202 (Ala. 1976), wherein a much less detailed affidavit than the one now before us was involved, the issue of whether it sufficiently satisfied the requirements of § 15-5-8 was not reached.
Thus, in Collins and Hare the positive averment requirement was satisfied by information supplied by a confidential informant.
Other states presently or in the past have had nighttime search warrant statutes or rules of procedure containing a positive averment requirement.[2]
In Johnson v. State, 617 P.2d 1117 (Alaska 1980), the Alaska Supreme Court, in discussing the positive averment requirement of Alaska R.Crim.P. 37 (a), stated at pages 1122-23:
 "In approaching questions of this sort, the decision of the judicial officer who has issued the warrant is to be given `great deference' and `the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.' Further, in resolving uncertainties and ambiguities with respect to search warrants and affidavits made to support them, the court should look to the circumstances surrounding the issuance of the warrant and need not artificially limit its inquiry to the writing itself.
 "The positivity requirement expressed in Alaska Criminal Rule 37 (a)(3)(iv) is nearly the same as that which was expressed by Federal Rule of Criminal Procedure 41 (c) as it existed until 1972, when the requirement was deleted because it had been found cumbersome to apply in practice. Current Federal Rule of Criminal Procedure 41 (c)(1) provides with respect to nighttime searches only that `The warrant shall be served in the daytime, unless the issuing authority, by appropriate provision in the warrant, and for reasonable cause shown, authorizes its execution at times other than daytime.'
 "Several cases construing the positivity standard as contained in the former federal rule did not construe it to require a significantly higher standard than probable cause. Thus, it was stated in United States v. Daniels, 10 F.R.D. 225 (D.C.N.J. 1950):
 "It is our opinion that the rule requires nothing more than an explicit statement, supported by positive evidence, as distinguished from negative evidence `that the property is in the place to be searched.' The explicit statement may not rest upon inferences drawn from the absence of evidence. The rule requires averments of fact sufficiently persuasive to support a reasonable inference that the property is in fact on the premises. A more rigid construction would require proof beyond a reasonable doubt that the property is in the place to be searched. Such a construction would enable the criminal to completely conceal an illegal enterprise behind an insurmountable barrier, provided, of course, he pursued it only at night.
 "If the positivity requirement were interpreted literally, it would be practically impossible to obtain a warrant to search premises at night. For example, if a police officer had observed drugs in a building, and then left the building in *Page 1012 
order to secure a warrant from the nearest available magistrate, he could not be positive that the drugs were in the building at the time that he gave the oath. The language must be construed to equate `positive' with being reasonably certain." (Citations omitted).
Furthermore, it is clear that our legislature did not intend that the affiant be positive that the property is on the person or in the place to be searched. As stated by the Supreme Court in Utah in State v. Treadway, 28 Utah 2d 160, 499 P.2d 846, 849
(1972):
 "The language selected by the legislature indicates an intent that to satisfy the statute the supporting facts in the affidavit must show positively that the property is in the place to be searched." (Emphasis added).
See Johnson, supra; State v. Adams, 18 Ariz. App. 292,501 P.2d 561 (1972); State v. Dudgeon, 13 Ariz. App. 464, 477 P.2d 750
(1970); State v. Snyder, 12 Ariz. App. 142, 468 P.2d 593 (1970), cert. denied, 400 U.S. 1001, 91 S.Ct. 475, 27 L.Ed.2d 452
(1971); State v. Lindner, 100 Idaho 37, 592 P.2d 852 (1979).
In all of the above cited cases, the positive averment requirement was satisfied by the hearsay information of a confidential informant. We adopt their reasoning concerning such and find that the positive averment requirement of §15-5-8 may be satisfied by hearsay information. Further, we adopt the position that our legislature did not intend the affiant personally to supply the positive averment requirement, but rather the affidavit, along with any supporting oral testimony, to satisfy such. Funches, supra.
Consequently, we find the instant affidavit sufficient to meet the positive averment requirement of § 15-5-8.
We have carefully examined this record and find no error therein. Thus, this cause is affirmed.
AFFIRMED.
All the Judges concur; BOWEN, J., in result only.
[1] Section 15-5-8 reads:
 "A search warrant must be executed in the daytime unless the affidavits state positively that the property is on the person or in the place to be searched, in which case it may be executed at any time of the day or night. The issuing judge or magistrate must state in the warrant, according to the character of the affidavits, whether it is to be executed by day or at any time of the day or night."
[2] See Alaska R.Crim.P. 37 (a); Ariz.Rev.Stat. Ann. § 13-1447 (1970) amended, § 13-3917 (1978); Idaho Code § 19-4411 (1979); Okla. Stat. tit. 22 § 1230 (1971); Utah Code Ann. § 77-54-11 (1978), repealed, § 77-23-5 (1) (Supp. 1980).