The defendant, Donald Ray Bohannon, was convicted of possessing in excess of 2.2 pounds of marijuana in violation of Ala. Code 1975, § 20-2-80. The trial court sentenced Bohannon to ten years in the state penitentiary and fined him $25,000.00. The Court of Criminal Appeals affirmed the conviction, 515 So.2d 153 (1987), and we granted certiorari. We reverse.
Bohannon was arrested after the Mobile City Police searched his mobile home pursuant to a search warrant and found a number of bags of a green leafy plant presumed to be marijuana. A Mobile County grand jury indicted Bohannon, charging that:
 Donald Ray Bohannon . . . did . . . possess in excess of 2.2 pounds of a controlled substance, to-wit: Marijuana, in violation of . . . § 20-2-80
of the Code of Alabama.
Section 20-2-80(1) provides the following:
Except as authorized in chapter 2, Title 20:
 (1) Any person who knowingly sells, manufactures, delivers, or brings into this state, or who is knowingly in actual or constructive possession of, in excess of one kilo or 2.2 pounds of cannabis is guilty of a felony, which felony shall be known as "trafficking in cannabis." If the quantity of cannabis involved:
 a. Is in excess of one kilo or 2.2 pounds, but less than 2,000 pounds, such person shall be sentenced to a mandatory minimum term of imprisonment of three calendar years and to pay a fine of $25,000.00. *Page 855 
Bohannon moved to dismiss the indictment on the ground that it failed to "fully and properly advise [him] of the offense he [was] called upon to defend." The court denied that motion and subsequently denied Bohannon's motion to suppress certain statements made at the time of his arrest and the physical evidence obtained during the search.
Bohannon waived his right to a jury trial. At trial, Clarence Willis, a toxicologist with the Mobile Police Crime Lab, testified about the tests he conducted on the evidence obtained in the search (specifically, State's Exhibit 3).[1] He testified that the bags contained both green plant material and seeds. Furthermore, he testified that he had emptied the plant material into a pre-weighed pan and determined that the weight of the plant material and seeds together — excluding the pan's weight — was 3.5 pounds. On voir dire, Willis testified as follows:
EXAMINATION BY MR. BYRD:
 Q. Excuse me, sir. But did you put — take all the contents out of each of those six plastic bags and put it on a metal container and weigh them all at the same time?
A. No, they wer[e] weighed individually.
 Q. All right, and you can, did this weighing before you conducted any tests on it to determine what the material was?
A. That's correct.
 Q. Do you know the legal definition for the word marijuana?
 A. I believe I do. It's plant material containing tetrahydrocannabinol, which is the substance for which these were tested.
 Q. All right, I see. These bags here you took the contents out of them, one of the bags, put it on the metal container, weighed it and put it back in the plastic bag?
A. That's right.
 Q. That it came from. That was before conducting any tests on any of the contents to see what it was chemically?
A. That's correct.
On direct examination, Willis's testimony continued:
 Q. All right, now, based on the tests you ran, were you able to arrive at an opinion as to whether, as to what the substance was that was contained in those packages? That is, the contents of State's Exhibit 3-A?
A. Yes, I did.
Q. All right, and what is that opinion?
 MR. BYRD: Object, Your Honor. No proper predicate has been laid; no proper definition of marijuana given by the witness and the mistaken assumption. All he needs to find is THC, and that's not the legal definition.
 Also, the material is irrelevant, immaterial, and we renew our motion to suppress.
 THE COURT: I will overrule the objection at this time.
. . . .
 A. Oh, all of the — all of the bags all — there are seven of them here, were positive for THC, and indicating that it was marijuana.
 Q. All right, and so based on the tests and the samples that you, the samples that you tested, in your opinion, is the entire contents of these bags that were enclosed State's Exhibits 3-A, is that marijuana?
[Objection to the question was overruled.]
Q. What is your opinion as to the entire contents?
 A. Based on the tests that were performed and the physical examination of all items in State's Number 3, which is this (indicating), 3-A, B, C, D, E —
. . . .
Q. Okay, now, that's —
 THE WITNESS: F and G. All items in No. 3 contain THC.
. . . . *Page 856 
 Q. All right, what is your opinion as to — you testified that there was approximately 3.5 pounds of green plant material. Based on the tests that you ran, what was that 3.5 pounds of green plant material?
MR. BYRD: Renew the objection on all grounds.
THE COURT: Overruled.
 A. Each bag was tested, and each bag independently indicated the presence of marijuana. That is, plant material containing THC and physically identified as marijuana as well.
. . . .
 A. All the items — all the plant material contained in this trash bag (indicating) weighed 1,656 grams, or approximately 3 1/2 pounds.
Q. And it was 3 1/2 pounds of what?
A. Of marijuana.
The court also questioned the witness with regard to the exhibit:
 THE COURT: Let me ask you: Regarding these individual packets which were taken from State's Exhibit 3-A; a number of things have items that look like seeds in them. Is that right? Do you know what those seeds are? Or did you ever test the seeds?
 THE WITNESS: We never; we never germinated them. I don't know whether they were viable. There was the presence of the tops of plants and stems top to bottom, but we never tested the — we didn't test the seeds for producing a plant. They were added into the samples, but we didn't test them separately.
 THE COURT: Did you test to see what kind of seed they were?
 THE WITNESS: No, other than germinating them, we, as a rule, just didn't grow the plants, because most of the time, if they were — a lot of times they were infertile. If the material was nothing but seeds, we would take a sample of it and test it as such, as seeds, and occasionally you'd get — mainly, you'd get a response for a test for THC, but when it was, this much in there and as much plant material added with it, the seeds were invariably in the sample, but we didn't test them separately.
THE COURT: You tested everything except the seeds?
 THE WITNESS: Oh, the seeds would be in the sample that we had taken or two or three samples from this, but as far as the seeds containing THC, it would be unlikely in the cases that I have seen, if you tested them.
 Because most of the time they are dried out and they don't contain an awful lot.
 As you go up from the bottom to the top of the plant, the THC content is usually highest in the flowering ends of the plant and lowest in the roots.
 And it was the seeds, as an immature plant itself would not contain very much, if any.
On cross-examination, the questioning of Willis revealed the following:
BY MR. BYRD:
 Q. Mr. Willis, in State's Exhibit No. 3, you weighed it before the first exhibit you looked at in the green plastic bag, correct?
A. Right.
 Q. All right, you said you weighed the contents of that plastic, those plastic bags inside that green plastic bag before you conducted any tests on them?
A. That's correct.
 Q. All right, the dried infertile seeds that were in that exhibit, they were weighed also, weren't they?
A. They were.
 Q. And they were not weighed separately from the rest of that exhibit, were they?
A. No, they weren't.
 Q. So you don't know how much they weighed of that total weight of 1.656 kilograms that you gave us, do you?
A. No.
 Q. They were a good number of stems in those bags, too, weren't they?
 A. There were some, yes. They are — I don't know what percentage it would represent. They were some — there were quite a number of them present. *Page 857 
. . . .
 Q. . . . I don't know if you will be able to answer this, but if you know, if you removed all the dried, infertile seeds and all the stems from State's Exhibit No. 3, and weighed only what was left, would it weigh less than one kilogram?
 A. I don't know, because I'd have to determine whether they were infertile or not.
. . . .
 Q. State's Exhibit No. 3 was made up mostly of seeds, wasn't it?
 A. It's hard to say. It appeared to have a significant amount, but having not counted them or separated them, which would be a tedious task, it — I can't really say.
 Q. Well, would you say that it's at least one-third seeds?
 A. I don't know. They are more easily identifiable, because they're distinctive little pieces of the plant, whereas the fragments of the leaves are not.
 Q. So it could have been any percentage, ten, twenty, fifty or ninety percent seeds. You just don't know?
A. I don't think I should guess at it.
On redirect, Willis testified that he did not conduct any tests on the seeds to determine if they were infertile, and if they were, how they became infertile.
Finally, on recross, Willis stated that his understanding of the "legal" definition of marijuana was that it was "cannabis sativa containing THC, and that it's necessary to show that it contains tetrahydrocannabinols."
The Court of Criminal Appeals affirmed the conviction and we granted certiorari. Although several issues were presented for review, one issue is dispositive of this case: Was there sufficient evidence to prove that Bohannon was in possession of over 2.2 pounds of marijuana, in violation of Ala. Code 1975, § 20-2-80?
This Court has recently held that in order to convict a person for trafficking in marijuana pursuant to Ala. Code 1975, § 20-2-80, the State has the burden of proving that the defendant possessed in excess of 2.2 pounds of the drug. Exparte Sellers, 519 So.2d 1292 (Ala. 1987); see also Borden v.State, 523 So.2d 508 (Ala.Crim.App. 1987); Mulhern v. State,494 So.2d 787 (Ala.Crim.App. 1986).
For purposes of § 20-2-80, marijuana is defined in Ala. Code 1975, § 20-2-2(15), as follows:
 All parts of the plant Cannabis sativa L., whether growing or not, the seeds thereof, the resin extracted from any part of the plant and every compound, manufacture, salt, derivative, mixture or preparation of the plant, its seeds or resin. Such term does not include the mature stalks of the plant, fiber produced from the stalks, oil or cake made from the seeds of the plant, any other compound, manufacture, salt, derivative, mixture or preparation of the mature stalks (except the resin extracted therefrom), fiber, oil or cake or the sterilized seed of the plant which is incapable of germination.
In Sellers, this Court summarily reversed a conviction under § 20-2-80, citing as authority the decisions in Borden, supra, and Mulhern, supra. In Mulhern the Court of Criminal Appeals reversed a conviction under § 20-2-80 because the toxicology laboratory report " 'disclosed the presence of marijuana' but failed to state the quantity of marijuana found within the plant material." Mulhern, 494 So.2d at 789. In Borden, supra, the Court of Criminal Appeals also reversed a conviction under § 20-2-80 because there was insufficient evidence of the weight of the marijuana. Therefore, pursuant to our decision inSellers the State's burden in the instant case is not simply to prove that the plant material and seeds it weighed contained marijuana; rather, the State must also prove the weight of the marijuana (as the term is defined by § 20-2-2(15)) contained in the plant material.
The State asserts that it met its burden of proving that Bohannon possessed in excess of 2.2 pounds of marijuana and that, pursuant to Dickerson v. State, 414 So.2d 998
(Ala.Crim.App. 1982), the burden shifted to the defendant to prove that some portion of the total weight was excluded *Page 858 
by the statute. Specifically, the State asserts that Willis's testimony that the substance he tested contained marijuana, and that it weighed in excess of 2.2 pounds, was sufficient to meet the statutory requirements. We disagree.
Dickerson, supra, held:
 [T]he burden is upon the appellant to establish and bring himself within any exclusion which is found not in the enacting clause defining a crime but rather in a subsequent clause or statute. Specifically, he must establish that the mari[j]uana seized from his residence contained excludable matter falling within the definition of such under § 20-2-2(15).
Dickerson, 414 So.2d at 1002 (cites omitted). But, in order for the burden to shift, the State must first prove that the defendant possessed in excess of 2.2 pounds of marijuana, as the term is defined in § 20-2-2(15).
The toxicologist, Willis, testified that the total weight of the green plant material and seeds was approximately 3.5 pounds and, in addition, that the green plant material and the seeds contained marijuana. Furthermore, he testified that the entire weight consisted of material containing THC, which he understood to be marijuana. However, on cross-examination, Willis's testimony revealed that the plant material he referred to as "marijuana" contained stems and seeds. Furthermore, on recross, when asked the legal definition of marijuana, Willis's response was that it was material containing THC. Sellers,Mulhern, and Borden clearly indicate that in order to prove that the defendant actually possessed in excess of 2.2 pounds of marijuana (as defined in § 20-2-2(15)), it is insufficient to state simply that the tested material contained THC. Willis's answer reflected a misunderstanding of the legal definition of marijuana, because § 20-2-2(15) specifically excludes certain parts of the plant, even though those parts may contain THC. Therefore, in light of the fact that Willis admitted that there were stems and seeds in the material that he weighed and the fact that Willis did not test the seeds to determine if they were sterile or infertile, there was insufficient evidence to prove that the green plant material contained in excess of 2.2 pounds of marijuana.
Furthermore, the toxicologist admitted that he had not tried to germinate the seeds and that there were some dried-out seeds and some infertile seeds. Section 20-2-2(15) excludes from the definition of marijuana any "sterilized" seeds. The distinction between "sterile" or "infertile" seeds and "sterilized" seeds was set forth in Dickerson, supra, which stated:
 In the context of the instant case, sterile means incapable of germinating, while sterilized means to have caused to become sterile, barren, or unproductive so as to deprive (the seed) of the power of reproducing — make incapable of germination or fecundation. Webster's Third New International Dictionary, page 2238; Volume X, The Oxford English Dictionary, pages 926-27, (1961). (Emphasis added [in Dickerson]). Consequently, the term sterile connotes a natural or organic inability to reproduce or germinate, while the term sterilized denotes an artificial process utilized to effect a sterile state or condition.
414 So.2d at 1002-03. Therefore, in order to prove that the material the toxicologist weighed contained in excess of 2.2 pounds of statutorily defined marijuana, the State must prove that the seeds were not "sterilized." The city toxicologist's testimony was that some of the seeds were probably infertile or non-germinating, but he did not test the seeds to determine if they were naturally infertile or artificially sterilized. Therefore, because the seeds were weighed with the plant material, and because it is possible that the seeds were artificially sterilized and thus not within the definition of the term "marijuana," the State failed to meet its burden of proving that the defendant possessed in excess of 2.2 pounds of marijuana.
Although several other issues have been raised on appeal, each is pretermitted by our decision to reverse the conviction due to the insufficiency of the evidence. *Page 859 
For the foregoing reasons, the judgment of the Court of Criminal Appeals affirming the conviction is due to be, and it hereby is, reversed.
REVERSED AND REMANDED.
TORBERT, C.J., and MADDOX, JONES, ALMON, SHORES, BEATTY and HOUSTON, JJ., concur.
[1] There were other exhibits containing green plant material introduced at trial, but the only exhibit at issue on appeal is State's Exhibit No. 3 and its subparts.